Argued and submitted November 6, 1985, reversed, order remanded to PERB April 1, reconsideration denied May 7, 1986

The SALEM FIREFIGHTERS LOCAL
314 et al,
Petitioners on Review,

v.

PUBLIC EMPLOYES RETIREMENT
BOARD et al,
*Respondents on Review.*

(CA A30197; SC S32012)

Gregory A. Hartman, Portland, argued the cause for petitioners on review. With him on the petition were Charles S. Tauman, Bennett, Hartman, Tauman & Reynolds, Portland, and Glenn E. Smith, Cheyenne, Wyoming.

William E. Nessly, Jr., Salem, argued the cause for respondent on review, The Public Employes Retirement Board. With him on the response were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

William J. Juza, City Attorney, Salem, argued the cause and filed the response for respondent on review, City of Salem.

LINDE, J.

**LINDE, J.**

Since 1973, police officers and firefighters employed by local governments have been entitled to retirement benefits under the state Public Employes' Retirement System (PERS), unless their public employer "provides retirement benefits to its police officers and firemen which are equal to or better than the benefits which would be provided to them under the system, as determined at the expense of the public employer by the Public Employes' Retirement Board." ORS 237.620(4). The question before us is whether the Board (PERB) misinterpreted the words "public employer provides retirement benefits * * * equal to or better than" when it confined its comparison of the City of Salem's retirement plan with that provided by PERS only to the relative value of major benefits, without taking into account that Salem required its firefighters to contribute a larger percentage of their salaries toward funding their retirement plan than do firefighters covered by PERS.

PERB has expressed its view of the statutory standard in a rule, OAR 459-30-025, which states in part:

> "(3) The Board's review of local public employer retirement plans will not consider the cost of the benefits to be provided or the proportion of the cost being paid by the public employer and/or the participating police officers and fire fighters. The Board will consider whether the benefits to be provided by the employer are funded, but the Board will not evaluate the adequacy of funding and will assume that all employer-paid benefits will be funded. Neither will the Board review whether the benefits are to be provided by a trust plan or insurance, or a combination of plans and insurance."

PERB undertook a comparison between the city's plan for its firefighters and benefits provided by PERS after the latter were changed in 1981 in a number of respects, one of which was to reduce the employes' maximum contribution to funding the system from 7 percent to 6 percent of gross monthly salary. Or Laws 1981, ch 761 § 1. The city's retirement plan continued to require a 7 percent contribution from employes earning more than $1,500 a month. PERB's order found as a fact that if the rate of contribution were the same, or if only employer-provided benefits were compared, the city's plan would not be "equal to or better than" the benefits provided by

PERS. Pursuant to OAR 459-30-025(3), *supra,* however, the order disregarded this difference. The order recited:

"Under this rule, the present value of future benefits is calculated the same regardless of whether the benefits are funded by employe contributions or by employer contributions. In other words, a plan that was totally funded by the employes of a public employer would be actuarially valued exactly the same as a plan totally funded by the public employer, all other things being equal."

In the Court of Appeals, petitioner contended that PERB's order was erroneous in this and several other respects. The Court of Appeals affirmed the order, holding that PERB's criteria for determining whether local retirement plans provide benefits equal to those of PERS were within the range of policy determination delegated to PERB by the statute. 74 Or App 201, 702 P2d 439 (1985). Having allowed review, we reverse the Court of Appeals and remand the order to PERB.

The relevant sentence of ORS 237.620(4) provides:

"* * * (I)f a public employer provides retirement benefits to its police officers and firemen which are equal to or better than the benefits which would be provided to them under the system as determined at the expense of the public employer by the Public Employes' Retirement Board, the public employer shall not be required to participate in the system with respect to its police officers and firemen. * * *"

Two different phrases of that sentence are at issue: first, the phrase "if a public employer provides retirement benefits," and second, the phrase "equal to or better than." Petitioner maintains that "provides" in the first phrase presupposes that the employer pays at least for some share of the cost of the benefits, and that only the employer's share is to be compared with the share similarly "provided" by the employer under PERS.

The Court of Appeals characterized the entire sentence as "delegative," a term that this court used in *Springfield Education Ass'n v. School Dist.* 290 Or 217, 223, 621 P2d 547 (1980).[1] Justice Tanzer's opinion for the Court in that

---

[1] The Court of Appeals relied on its earlier opinion in in *Oreg. Fire/Police Retire. v. PERB,* 62 Or App 777, 662 P2d 729, *supplemented* 65 Or App 465, 671 P2d 729 (1983), *rev den* 296 Or 464, 676 P2d 878 (1984), where it had held ORS 237.620(4) to be "delegative."

case dealt with the judicial task in reviewing agency action as the legislature selects more or less exact terms in assigning to an agency the ends and means of a statutory policy. Exact terms (quantities, nouns describing tangible things or physical properties, proper names, dates, and the like) are likely to leave only facts and not interpretation at issue, unless a term is shown to have some special or secondary meaning in the particular subject matter of the agency's assignment, but when a statute employs broader and more inexact terms, courts often must turn to secondary legislative sources and inferences to determine whether the agency has misinterpreted what the legislature meant. Justice Tanzer then described as "delegative terms" those statutory words or phrases in which a legislative body either expressly or in effect chooses "to give to an agency the authority, responsibility and discretion for refining and executing generally expressed legislative policy" and for "completing a value judgment that the legislature itself has only indicated." 290 Or at 228, *quoting McPherson v. Employment Division,* 285 Or 541, 550, 591 P2d 1381 (1979).[2]

Delegated policymaking most obviously occurs when the terms of a statute cannot and are not intended to be applied directly but only authorize and direct the adoption of regulations. This is expressed in the terminology of distinguishing between "legislative" and "interpretive" rules.[3]

---

[2] In an introductory summary, quoted by the Court of Appeals, the *Springfield Education Dist.* opinion briefly referred to these "terms of delegation" as requiring a "legislative policy determination by the agency." 290 Or at 223. The phrase leaves an ambiguity whether the agency is to determine a "legislative" (i.e., the legislature's) policy or make a policy determination that is "legislative" in nature. The word "legislative" describes a particular kind of institution (normally of elected representatives) and process (normally openly political and not confined to preassigned objectives or to informed, unbiased, and reasoned decisions by its participants). This is what makes delegation of *legislative* power a constitutional battleground, unless the delegated actions can be related to some general policy objectives and finite range of means expressly or implicitly enacted by a legislative body, or unless the delegation only allocates "home rule" authority to another democratically accountable legislative institution. *See, e.g., Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO v. Connally,* 337 F. Supp. 737 (DDC 1971) (economic stabilization), *Anderson v. Peden,* 284 Or 313, 325, 587 P2d 59 (1978), Bruff, *Legislative Formality, Administrative Rationality,* 63 Tex L Rev 207 (1984).

Any choice left to an agency (or to a court), however narrow, can have the same "lawmaking" effect for particular parties as the widest discretion, but it is not a delegation of *legislative* power as long as it can be invalidated for exceeding the bounds of ends and means intended by the legislative institution in making the delegation.

[3] *See* Schwartz, Administrative Law, 153-55, § 58 (1976); 5 USC § 552(a)(1), 553

But rulemaking requirements are distinct from judicial review; statutory terms often leave important value judgments for direct application without prior specification by rules. *See Ross v. Springfield School District,* 300 Or 507, 716 P2d 724 (1986); *Trebesch v. Employment Division,* 300 Or 264, 710 P2d 136 (1985).

■     In the present case, the Court of Appeals treated all of ORS 237.620(4) as a "delegative" formula without distinguishing its two parts. We do not agree that the phrase "if a public employer provides retirement benefits" delegated to PERB the responsibility for choosing whether the comparison with PERS should include or should disregard the question who pays for the retirement plan.

■     Respondents argue that the sole legislative objective was to assure police officers and firefighters of adequate retirement benefits, and that the extent to which the benefits to be compared would be funded by the employer or by contributions deducted from the employes' salaries was left to collective bargaining. This reading of the statute is not impossible, but it is unpersuasive; the question is not of the kind that the legislature likely left to PERB's discretion, nor to the generosity of any local governments that do not have collective bargaining contracts with their police and fire personnel.

ORS 237.620(4) refers to "providing" benefits twice in the same sentence: a public employer need not accept PERS coverage if it "provides" retirement benefits equal to or better than the benefits "provided" by PERS. The statute was enacted late in the 1971 session of the Legislative Assembly, after the salary subcommittee of the Joint Ways and Means Committee (which normally deals with the state's budget) substituted it for a different bill. The direct legislative history

(1977) (distinguishing between "substantive" and ""interpretive" rules). Interpretive rules can interpret other rules as well as statutes or decisions. The federal Administrative Procedure Act exempts most "interpretative rules" from rulemaking procedure, though not from publication. 5 USC § 553(b).

Even more common than in the regulation of private activities is broad delegation of discretionary authority to operate and manage large and complex public programs, such as universities, hospitals, and scientific, cultural or recreational institutions, where political control often is exercised through funding rather than statutory directives. *See, e.g.,* Note, *Enrollment Limitations on the Oregon State System of Higher Education, 1969-71: Fact or Fiction?* 49 Or L Rev 322 (1970); *cf. Planned Parenthood Assn. v. Dept. of Human Res.,* 297 Or 562, 687 P2d 785 (1984).

of the statute therefore is sparse. But the Public Employe Retirement System, to which the alternative plans are to be compared and under which other public employers would be placed if they did not provide equal or better benefits, was and is funded by employers as well as employes.[4] A memorandum to Senator Groener from a staff member at the legislative fiscal office explained that under the retirement provisions of the bill, local governments would incur costs between 6 and 12 percent of covered payroll, that most local governments were expected to accept PERS coverage, that the costs would have to be included in their operating budgets, and that "each city, county or district which now provides no benefits will be obligated for an additional expense ranging from seven and one-fourth to 14 and one-half percent" for their police and fire employes. This memorandum may or may not have been an accurate analysis of the fiscal details, but it shows that those who followed the matter thought of the bill (and therefore of the comparable plans) in terms of the funding formulas of PERS. Moreover, the parties agree that the option to provide an alternative plan was put into the bill primarily to preserve existing retirement plans of the City of Portland and Multnomah County, both of which were funded by a mix of employer and employe contributions.

■　　The statutory text and background thus foreclose PERB's exclusion of the funding issue from comparison in the manner stated in OAR 459-30-025. They leave open, however, the question how plans are to be compared when the relative contributions of employers and employes as well as the benefits enter into the comparison.

■　　It is easy to conclude that if benefits are in every respect identical, an employer's plan is not "equal to or better than" that of PERS when the employer makes the employes contribute more of the costs from their salaries. The advantageousness of the plans is to be compared from the standpoint of the persons "benefitted," the employes. But other combinations of contributions and benefits are harder to

---

[4] When ORS 237.620(4) was enacted in 1971, employes contributed between 4 and 7 percent of their salaries to the Public Employes' Retirement System, and employers were required to contribute such amounts as the Board actuarially determined necessary to provide the system's statutorily mandated benefits. ORS 237.071, 237.081 (1971 Replacement Part).

compare. If the employer "provides" a plan that gives employes greater benefits than PERS at the price of larger contributions from employe salaries (even though the employer contributes as much as it would to PERS), PERB then might face the question whether the greater benefits are or need to be in some sense proportional to the increased contributions made by the employes, assuming that the relative values of two different sets of benefits to a typical or average employe or to all employes collectively can be quantified. Also, whenever an alternative plan does not match or exceed PERS benefits in every detail, the difference may prove better for some and not for other individual employes, the more so if one or both plans give employes a choice between fixed or variable retirement annuity programs.

We therefore do not agree with petitioner's contention that "equal to or better than" are exact, in fact mathematically certain, terms that leave no room for interpretation but only for factfinding. This presupposes a common measure of different benefits. Petitioners find such a measure in reducing different benefits to their "aggregate total actuarial present value," which PERB has adopted in OAR 459-30-025(1) and which they assert PERB has failed to follow by comparing only four categories of benefits.

■ We do not believe that the legislature meant PERB's determination of "equal or better" benefits to follow one mathematically exact actuarial formula and to exclude any qualitative judgment by PERB. The statute could have stated such an actuarial formula, or it could have required "identical or greater" benefits, which would have made any agency judgment largely superfluous. But the statute states that benefits are to be "equal to or better than" those provided by PERS *as determined by PERB*. That phrase leaves to PERB some responsibility for comparing plans that do not have identical or directly comparable features, a responsibility that increases when differences in employe contributions must be taken into account, as we hold.[5] When the consequences of

---

[5] The United States Supreme Court dealt with a similar interpretive problem in *Addison v. Holly Hill Fruit Products,* 322 US 607, 64 S Ct 1215, 88 L Ed 1488 (1944). The Fair Labor Standards Act, 29 USC § 201 *et seq.* (1938), exempted employees "within the area of production (as defined by the Secretary), engaged in * * * canning of agricultural or horticultural commodities for market." 29 USC § 213(a)(10). A majority of the Court concluded that the parenthetical phrase gave the administrator

adding this factor to the comparison are considered, possibly PERB will decide to revise its entire formula in a manner that also supersedes the exclusion of one or more of the benefit factors to which petitioner objects. The statute places responsibility for determining the relevant retirement benefits provided by public employers to PERB, and we do not anticipate or prejudge what PERB may decide upon refining its comparative analysis.

The decision of the Court of Appeals is reversed and the order is remanded to PERB for further proceedings.

---

authority to consider economic factors in defining geographic "areas of production," but that he had exceeded his authority by limiting the exemption to establishments employing no more than seven employes.